3210468, the people of the state of Illinois, Eppley v. Leslie A. Jett, Appellant. Okay, Mr. Hanlon, you may proceed. Thank you, Your Honor, and may it please the Court and good afternoon, Counsel. I represent Leslie Jett. I appreciate the opportunity to address this Court regarding this very important case. I'd like to start with what I have as argument number two pertaining to the closing argument issue. As Your Honors know, this is a difficult case. This is a child death case, one where things that inflame a jury are, of course, to hopefully be avoided. Unfortunately, what we had here, though, was argument that could only inflame the jury. Again, as I said, I presented that in argument number two. The argument specifically is, and I'm still somewhat befuddled by the argument as to how this could ever be justified as proper, considering the fact that the state put on, you know, medical evidence, a good deal of medical evidence, about wounds that this child has suffered over a period of time. Yet, in closing argument, as I set it forth in my brief, of course, on page 27, yet in closing argument, the prosecutor went on at some length about how it must have been an extreme amount of effort, and again, I'm obviously paraphrasing, but it must have been an extreme amount of effort that it took this defendant to inflict approximately 260 wounds to this child. Think about it, how long that would have taken, approximately four and a half minutes to inflict 260 wounds to this child. The number 260 came from the testimony of the pathologist. That number included, according to her testimony, included both externally visible and internal injuries to the child. So the prosecutor's argument was that we have this four and a half minute period of time, and this is when this child was injured. And imagine, ladies and gentlemen of the jury, how much effort that would have taken to inflict those injuries. Your Honors, that was not the testimony. This is a misstatement of what the testimony was. The testimony was from Dr. Umans, I think it's pronounced, and Dr. Petrick, that the wounds actually went back into 2019. The injuries went back into 2019. The state also introduced evidence, photographs, of the child reflecting, showing injuries to his body prior to the date that this occurred, which I believe was February 18th of 2020. And so this is just simply contrary to the evidence and could only serve to, I mean, the imagery of a person beating a child 260 times, hitting and striking a child 260 times within a four minute period is just ugly. And it's frankly disturbing. And, you know, the point of this issue is that we have regular people sitting on this jury after seeing photographs and other evidence regarding this ultimately deceased child, after, you know, it's hard enough, as I said, this is an inflammatory situation to begin with, then they hear argument painting the most gruesome and inaccurate of portrayals of how this occurred. So that's, you know, that's the, you know, when we get down to it, that's the bottom line of this issue is they made inaccurate, extremely inflammatory argument. The states in this brief argues that, you know, what does it essentially, what does it matter if the 260 blows were rendered in four minutes or a longer period of time? And the answer, your honors, upon reading the record is pretty obvious. First of all, four minutes was just not the truth, but morally and more importantly, this prevented, this argument stopped to, I mean, how could the jury not be confused having heard that argument and then reflecting on the evidence? Wait a minute, didn't we just hear that different things were happening in this child's life over the previous months? For example, we heard from the defense, a lot of evidence about the older brother wrestling with him. We heard evidence about the father and the two older brothers roughhousing with this four-year-old child. We heard that this child was naturally clumsy. We heard about a lot of different things that could explain these injuries. But when the prosecutor then takes that month's worth of testimony, including the medical, including the medical, and shrinks it to a four-and-a-half-minute period, that's not the evidence. And again, that can only confuse the jury and prejudice the case where, oh, I guess we don't, maybe we're not supposed to listen to that evidence about the old injuries and the other possible causes of the injuries. They're saying it happened that morning by Leslie Jett in a four-and-a-half-minute period. And that was not the evidence, plain and simple. I mentioned the testimony of Dr. Umans and Dr. Petrak. Dr. Umans, in particular, testified that the injuries suffered by this child could be classified in three different manners, acute, subacute, and remote, which essentially meant close in time, a while back, or older. Three different timeframes of the injuries that this doctor testified to. And so as I read this closing, I was trying to figure out, okay, wait a minute, what happened to acute, subacute, and remote? That's, again, this is just off the evidence. Your Honors, I think that the, again, the damage from this, I mean, we just, you know, besides the fact that it's a child case and the images that this paints, it just really, it kept, it suggested to the jury that they shouldn't consider the evidence that the defense put forth. And that even the state put forth that, yes, this child did wrestle with his brother. And, yes, this child did roughhouse with his brother, two brothers, and father. I don't think there was any question about that, but the jury said, no, that doesn't exist. We got to just consider the short time period. So, Your Honors, I appreciate the opportunity to raise and explain that issue. And I thought that oral argument of this issue was important because I just wanted to respond to the state's claim that it doesn't matter. Well, you know, and at first glance, well, Mr. Hanlon, what does it matter that if these injuries were all right then or they were longer in time? Well, there was explanations for the injuries. And this, the more we narrow the period of time, the more of those prior explanations and the photos of the prior wounds. I mean, what was this father doing? Leslie Jett was a girlfriend of the father of the child. What was this, you look at the evidence, what was this father doing when his child is, you know, in his house every day, all wounded and bruised? What was he doing? That raised a legitimate question for the jury to consider as to whether, you know, who caused these injuries? Was it the wrestling? Was it the father? Was it any number of these other things? And again, as I said, you know, that evidence just got lost once the prosecutor made this argument. Your Honor, I'd also like to mention briefly with my remaining time, I'd like to mention what is argument number one in my brief, which pertains to the motion to suppress. This argument just, you know, as a lawyer of many years, this process bothers me. And, you know, it bothers me, it doesn't matter. But just as a lawyer, I'm just concerned when a judge says, you, prosecutors, you have met your burden to put on a prima facie case as to the defendant's motion to suppress. You have met it merely by the fact that I, the judge, have watched the videotapes of the body cams. I've watched it. That's good enough. And so you, prosecutors, have met your burden. And I should have said first that the defense filed a motion to suppress confessions, statements, and other evidence which was obtained in an unconstitutional manner. It was entitled Motion to Suppress Statements, but goes on to make it a little bit more broad in terms of just the word statements. And so a hearing was held on that motion. And the state, though, before the hearing, filed a motion requesting that the court view the videos. I think that makes sense. The hearing was not going to be for several days. And so let's give the judge an opportunity to look at the videos before the hearing starts. The defense agreed with that. That's a time saving thing rather than sitting in court for eight hours and watching them there. Defense below had no problem with that. Neither do I. But then what ensued was the court saying, well, you've met your prima facie burden of going forward with the evidence, despite the fact of calling no live sworn witnesses. And, again, just as a member of the bar and as an officer of the court, I think this should be concerning. The authorities that I've cited are obviously in that similar vein. I think that 114-11, the state argues, well, 114-11 does not apply because this isn't a confession per se. You know, I think that's putting form over substance. I mean, this evidence came in. It was a part of the state's case. They can call it whatever they want. I know that, you know, we know there's a difference between an admission and a confession. I understand that. But they used this evidence that came in through those body cams. They used that evidence to try to convict Leslie Jett. They used that evidence to say that she was a liar, to shoot down her defense of how this happened. So this is critical evidence, no matter what we called it. And the state below, I'll say this, counsel on appeal made this argument, but the state below made no such argument. They litigated the defense's motion to suppress statements without saying, oh, wait a minute, this is not a confession. The word confession is in your motion, counsel, and it's not a confession. They litigated this on the merits of it. So I think that this argument was waived below. I appreciate that counsel has raised it here. But this was not argued below, and this court should not consider it for all of these reasons. And, Your Honors, for now, that's what I want the court to consider. I see that my time is almost up. And so thank you. Are there any questions from the court? Yes, Justice Oldridge. Mr. Hanlon, did you have a problem with the fact that the judge presumably viewed these in camera or in chambers? Can you hear me okay, Mr. Hanlon? Can you hear me okay, Mr. Hanlon? And, Your Honor, I apologize. I should probably turn my volume up. I did not hear. I heard, do you have a problem with it? I did not hear what was after that. Okay. Can you hear me all right now, though? I want to make sure. I'm turning my volume up. Yes, sir. Okay. It seems that your objection is that there was no live testimony, that it was only the video cameras. Would your opinion change if the court took the time to view the video cameras in the presence of the parties as opposed to in chambers? No, that would not be good enough, Your Honor. I think that there's a reason why we have people come into court and raise their hands and be subjected to cross-examination, which there were no witnesses that were subjected to cross-examination. So, respectfully, no, Your Honor, that would not be good enough. Didn't the court give the defense an opportunity to have those witnesses available in court, and they could have been called? Am I correct about that? I know I'm correct about that, but doesn't that assuage any concerns you would have about asking questions about things that may be important based on the evidence that was recorded? I appreciate that question, Your Honor, and I know that that's part of counsel's responsive argument to this issue. And, well, at least two things real quick. No, go ahead. We're having some technical difficulties. Thank you, sir. So, first of all, what the court offered was a chance to, quote, talk to the officers. The word was talk. Now, what does that mean? Hey, go in that room over there and interview them if you want to. I'm not exactly sure. But I'm looking for the page where that word is quoted. I know it's in counsel's brief. But that was the word. First of all, that's the first problem. Second of all, you know, it's one thing, Your Honors all know this, it's one thing for an attorney to be able to put a witness on the stand. It's quite another to say, well, we're going to say that, I mean, this was out of order. And that makes a big deal because the judge went on after the body camps to find that the prima facie burden had been met without hearing any cross-examination. So, sure, the judge was like, okay, well, maybe I should let you talk to these witnesses. That's not good enough. This should have been, there should have been live witnesses in court while the state still had the prima facie burden. A fair reading of the record is that the defense attorneys were really shocked that, whoa, you're going to do it just on the, we're okay with you looking at the videos, but we're going to go to the prima facie burden just on those? And there's a big argument in court about it. And then, yes, there was an offer to let them talk. But it was, you know, too little too late, Your Honor. I understand your argument, but I want to clarify one more point. And that is, there has been no argument raised that the videos were incomplete or altered or in some way misleading. Am I correct about that? That's correct, sir. Thank you. That's all I have. So, Mr. Hamlin, your argument is, is that the element question to be determined was whether it was voluntary. Correct. The statement. That's correct. Your Honor. Voluntary potentially issues of Miranda. But, again, because there was no cross. I just have to be honest and say, I can't fully answer your question, Your Honor, because there's no. What was the underlying purpose? What was your motion to do? Suppress? Yes, sir. Okay. I'm looking at the motion right now. It was a motion to suppress statements. Okay. Okay. And what was the underlying argument for that? The motion was not as precise as some might be. But the idea was the motion raised issues of voluntariness. The motion raised an issue of requests for counsel. And I've set forth the citations for those in my in my brief. Okay. And the tape, the tape. Was it was a needing explanation or did it speak for itself? Well, I, you know, again, I mean, I've looked at the tapes. And, again, without a full chance for defense counsel to cross examine, such as did you talk to her before you started rolling your your body camera? Has this been edited in any fashion? We know that there was an editing process eventually because they took some of it out so they could play a certain portion of it for the jury. What went on before this? What went on after this? What other what other information did you receive relative to this to this this person? So, I hope that answers your question. No, it does. I mean, I wanted to get the specifics of what you're asking for cover. I think that this excuse me. I didn't mean to interrupt. I just think that this is a slippery slope, a terrible slippery slope for when when judges hearing motions to suppress say, I've looked at the videos. That's good enough. That's not good enough. With all respect. That's not good enough. And so that that is the nature of my claim. Are there any other questions by the court? Justice Albrecht. No. Just settled. Okay. Thank you, counsel. You'll have time and reply. Thank you. Council be alone, isn't it? Byline. You may respond. May please the court. Good afternoon, counsel. Laura byline on behalf of the people. I will address the 1st issue raised in defendants brief 1st and then switch to the closing argument issue because the 1st issue, there's some points raised in the reply brief that require a response. So, the 3rd issue, the 1st issue is whether the trial judge held a proper suppression hearing. And in under rule 341 H7, defendant has forfeited any arguments not made in our opening brief. In her opening brief, defendant argued the requirements of section 114-11 were not met. So, that's the reason why the people's brief focused on 114-11 because that's the only support that defendants brief relied on in arguing that there was a requirement for live testimony. Defendants now arguing that the state was just generally required to present live witnesses, whether or not that statute applies. But defendant forfeited arguments not based on the statute by not relying on anything other than the statute in her opening brief. The statute does not apply because it concerns the admissibility of confessions and a confession is not at issue here. The statements that defendant made were very imploratory because they didn't match how the injuries to the child occurred, but they were not a confession because she did not expressly admit guilt. Even if the statute did apply, live witness testimony was not required under the facts of this case. The statute states only that the burden of going forward with the evidence and the burden of proving that a confession was voluntary shall be on the state. It does not specify what type of evidence is required in order to meet those burdens. Here, every single interaction between defendant and police officers was recorded and the trial judge viewed all of the recordings covering all of the interactions. It was agreed that the recordings presented covered all of the interactions that police had with defendant. So where the trial judge had seen the recordings between all of the interactions between defendant and the police officers, additional evidence was not required. Let's kind of break it up here. So there was an agreement that it hadn't been edited? The parties agreed that this covered every interaction and I think there was maybe one more tape that defense counsel wanted the court to view, so that was viewed in court as well. And then while the court had found that the prima facie case had been met with just the video testimony, the state did call an officer to testify. And I believe the officer, Officer Fisher, did testify as far as that it was the total of the interactions or which interactions occurred when. Was that true at trial in terms of, I'm just looking at Mr. Hanlon's concerns about the inadequacy of just having the judge make a ruling without having the benefit of cross-examination and advocacy by counsel? As far as the benefit of cross-examination and advocacy, defendant is arguing that the people needed to present the live witnesses in order for him to cross-examine them. But defendant did have a full chance to question any officer that she wished to question and she declined to do so. The trial judge stated that he would have the officers come in in order to present an issue going forward. From the context of what the transcripts say, I don't remember the word talk, but I remember the transcripts. Clearly, they're talking about having these officers come in to testify and be cross-examined. When the trial judge stated he was going to try to prevent an issue going forward by having the officers in, defendant affirmed that she didn't want to call any of them. The trial judge went down name by name by name, there's four different officers. You don't want to call this one, this one, this one, this one. Defendant didn't wish to call any of them. The state was also willing to call the officers in for defendant, but defendant declined that offer. Three of the officers were even in the building at the time, so it wouldn't have even required moving the hearing to another day. Defendant still didn't decline the state's offer to bring those officers in to testify. Then the people did call Officer Fisher, I believe it was, and defendant declined to ask that officer a single question. There was this opportunity, a full opportunity to question the officers. Where all of the interactions with police were recorded and in evidence, the trial judge held a proper suppression hearing and could make a decision based on that evidence. Are there any questions on this issue? Doesn't appear to be. As far as the closing argument issue, argument was not inaccurate or improperly inflammatory. The state's argument was a little bit different than represented by defendant in her brief. Defendant argues that the state improperly argued that the child's injuries were in a four and a half minute timeframe. However, the state didn't argue that the child's injuries were definitely inflicted in this four and a half minute timeframe. The state's argument instead was clearly presented as a hypothetical concerning the possible minimum timeframe if assuming, and it was clear that it was assuming, a rate of injury of one per second. The state actually argued that the injuries could have been inflicted over a 71 minute time period in their closing argument. And the state argued that based on the number of injuries, that would have taken a substantial amount of time. So the state's not trying to say this is definitely four and a half minutes. Instead, the state's argument was that the beating of the child would have taken some time and effort, meaning that the seven-year-old brother could not have perpetrated the attack, especially without defendant's knowledge. While there were some injuries on prior occasions that were discussed by defense counsel today, there was evidence that the 260 injuries or the bulk of those injuries were not remote. The testimony describing the categories of injuries is just describing the categories of injuries. She then went on to describe many of these specific injuries as acute. She was talking generally in terms of areas of the body, and there were certain ones where she said all of them were acute. A few she did say had injuries of different ages, but the bulk of them she described as being acute. She said that a bruise can occur within minutes. So with all this bruising, these bruises could have been that morning. They could have been within minutes. The testimony of the abdominal surgeon, Dr. Munaco, testified that the abdominal injuries occurred within three hours of 1150 in the morning, based on what he saw when he did two separate surgeries. And he also testified that those injuries would have required very significant force to inflict. The misantery is not injured very often at all. Only in high-speed car crashes is that generally seen. So again, he said not the type of injury that a seven-year-old would be even able to inflict. Dr. Petrak also described how swelling indicates an injury is very recent and described swelling she saw on the forehead and eye of the child. The lay witnesses described, I think, a little bruise by the eye, some three scratches on the chin, and a mark on the cheek that were seen in the days leading up to the February 18th injuries. So yes, there were some injuries, and he had had some injuries in the past, but no one had ever seen him look like he did on February 18th, 2020. He's covered absolutely head-to-toe in bruises. As soon as the paramedics walk in, they see bruises everywhere, and the photographic evidence bears that out, as does the autopsy evidence that indicated 260 separate injuries, with the doctor testifying that the injuries were the result of blunt force trauma inflicted and due to child abuse, and each of the 260 different injuries would have required at least one impact, because if an impact was made to the same spot twice, that would just result in one of those 260 injuries. So the medical injury evidence did show that the injuries were so numerous they took time and effort to inflict, with 260 separate injuries described, doctors testifying that they were inflicted and due to child abuse. Some of the injuries were described as indicating child abuse all on their own. Others were described as defensive injuries. Some of the injuries the doctors testified could not have been inflicted by a child, and some required significant and repeated force and would have caused immediate pain that would have been noticed by anyone who was around the child. Moreover, even if the argument was improper, reversal is still not warranted because there's no substantial prejudice in this case. The jury was instructed properly that closing argument is not evidence and to disregard any argument not based on the evidence. The trial judge even gave this instruction specifically when the four and a half minutes argument is discussed and before and after closing argument, and it's in the jury instructions that were given. So the jury instruction was sufficient to cure any prejudice, especially in light of the fact that the evidence in this case really was not even close. The medical testimony described the extreme number and type of injuries, including the fatal abdominal injuries that had to have occurred within three hours of 1150 in the morning. Only defendant and a sleeping two year old child were home at that time. Plus defendant gave multiple false exculpatory statements indicating consciousness of guilt. These injuries would have caused immediate noticeable pain and symptoms, yet she said she didn't notice anything unusual until the child slipped and fell. The injuries could not possibly have occurred in the manner that she stated that they occurred. Evidence also shows she made up a story about cleaning the fish tank as when the paramedics came in, they came in first. The child was lying in the L of a sectional on carpet in the living room and he's not wet and they went through the area where the water allegedly would have been and no one slipped on anything or noticed any water when the paramedics were there. Minutes later, when the officer shows up, there's water, but it's it's by the dishwasher. And so there's evidence that she's making up the story also with the cleaning of the fish tank. The bucket that's used to clean this fish tank is it has a cigarette butt in it. That's the type of cigarette, but that no one in the house smokes. Only some people have been there a few days before smoke that type of cigarette. But this bucket is not being used to clean the fish tank. Nothing's going on on the actual cleaning of the fish tank. It's just evidence that she's trying to give a false exculpatory statement about what happened. Plus, on a prior occasion, defendant had had given explanations for injuries that the child abuse pediatrician was able to opine as an expert that didn't match the explanation given. So defense counsels asked, what's the father doing? Well, the father was believing the explanations his girlfriend was giving him. His child is in the care of his girlfriend. It's a living girlfriend. They're in a relationship. They're in a close relationship. He doesn't want to believe that she is hurting his child. So when she says, oh, he ran into a doorknob, he believes that he's not he's not a child abuse pediatrician. He doesn't know that that explanation is is inconsistent. Moreover, defendant tried to get her husband to falsely estranged husband to falsely accept responsibility for injuries to the child. She wants him to take the fall for this, even though she knows he had nothing to do with it. And she had sent numerous angry messages to the father about resentment for watching the child, including that same month, expressing this is going to blow up real soon. This is not how I plan to live my life. And she had a fight with the father the night before about not having enough time for herself and her son. In light of all the evidence, the jury's verdict would have been no different absent the challenged remarks and no substantial prejudice occurred. If there are no further questions on this issue, the people would ask that the court affirmed defendants conviction and sentence. Any questions? I'm looking counsel for the sequence in which the judge and that's why I'm looking beside here another computer screen. The sequence in which the judge made the finest finding that it was voluntary and when the options were offered in whatever capacity it was. Do you know the answer to that question or do you have a site to point me to? So, this is on. I, so I'm going back to the suppression issue that we spoke about 1st. Yes. I have it on 198, 198 that the state was willing to prevent present the officers for the defense and the child judge asked if the defense attorneys want to talk to any of these 3 officers that are present today to address defendants concerns. Defense counselor applied based on the court's ruling, which would have been another case. We would accept the court's ruling and move forward. Defense counsel confirmed. He did not want to call any of the 3 officers that were in the courthouse or officer or I have that as being page to 11. I think 195 is actually where the 1st discussion came by and I think that the comments in my brief reading of this may be accurate in the court finding that it was. Finding a volunteering is 1st, but that's the only question I had. I, I will, I believe I believe that's correct. I think that the prima facie case had been found before the. Offer to bring the officers came in occurred. That is that is correct for my recollection as well. Do you have any further questions based on that sequence? I do not very good. Thank you counsel. Thank you. Your honor. Mr. Hanlon, you may reply. Oh, you're you're turn on your you're on mood. Yes. My apology happens often. So, regarding the latter, just part of the discussion that you just had with counsel, I think that the portion of the record that you all just discussed is accurate. It's from approximately, as I have it approximately page. 180 of the record to. 199 is where this entire discussion. Occurs and. And again, counsel, and just. Discussing this to the court, just. Quoted again, the judges offer that. The defense attorneys could quote, talk with the officers and again, this is after after the fact, you know, she and she mentioned that a detective Fisher was called this too was was what he was called. But it was well, after the fact, you know, the defense attorneys. Objected to this procedure, they objected to this. And I'm looking at. 191 to 195. Where the where the defense attorney. Said that, no, we think that this is the state's burden to move forward with these evidences, not on us. To do that, it's the state's burden to do that. So, the word and in counsel's brief. The citation is given to pages. Page and her brief on pages. Page 9 of her brief. Health brief sites to. Record 209 dash to 10. For where the judge made an offer that the testers could quote, talk to the, could talk to the witnesses. So, again, I just think this is is this whole thing is just really out of work. And maybe the, maybe the, maybe almost not worth speculating. Maybe the judge realized, you know, I. They have to prove their burden 1st. So, councils, if you want a chance to talk with the witnesses, and maybe then call them. You know, again, it's too little too late with all due respect to, uh, to the, to that judge and to your honors. So, um. Counsel also said that that. I had, we had waived our. Argument relative to the motion to suppress. Because we cited only the statute and again, I'm perplexed because I cited a number of cases. Relative to this argument on pages. 23, well, really page 21. Through 24 of my brief, I cited a number of cases, so I'm not sure what. What that argument is exactly council also said, quote, every interaction. Between jet and the police was recorded. And, you know, it would be nice if we had testimony to point to where, you know, where the officer said, yes, our cams were on the whole time. We recorded everything, but we don't have that. It's the uncertainty and again, this is just a, this is not just a process. I mean, this is both a substance and a process question. It's a substance question because. They, as counsel acknowledged, this was inculpatory. Testimony or evidence that was received off of the body cameras, they use that. And culpatory statements. All by themselves are not necessarily. Are not necessarily confessions and are admissible. Correct. May be the case, but according to people versus. I understand your honor. I appreciate that that position. However, all I know is that as we read this record, they used those statements. To say, she's a liar. You can't believe her when she said this version of the of the events. So, in the case that they cited for this, and I. I think you just named. Is is factually not on point as I explained in my in my. Uh, reply brief whittles. Yeah, the, the whittles case. And as I noted very clearly in my reply brief, that case had nothing to do with the state's burden. At a suppression hearing, so, um. I don't think that that case is strong authority for relative to this argument. Your honor. I see that my time is expired. So thank you very briefly address the closing argument. There's a lot of time spent by opposing counsel on that. Why it's. It doesn't matter. The evidence is so overwhelming. The evidence. Yeah. Okay, I certainly will. Yes, there is. At from 1 point of view, there is, there is that evidence. However, your honor, as I said. There was a lot a lot of pages, a lot of testimony in this record. About other explanations for these injuries and that's all that the defense was asking. The jury to do was to consider the other testimony, which again started with. By his own father's acknowledgement. Yeah, he was a really clumsy child. He was always running into something and falling over. So, starting with that, and then going to the brother, there's a lot of testimony about the brother. And then there was an older brother beyond that and the word roughhousing. Was used a lot along with the word with the word clumsy. Well, given that all exists, Mr. Hanlon. Then it's incumbent upon the prosecutor. To try to say that evidence could not. It is not cannot be used to conclude that the defendant did not kill this child. Through physical beating certainly your honor. Okay, certainly. Yes. Yes, your honor. Okay, so there's something wrong in your mind with the way in which. The prosecutor in closing argument attempted to meet the burden of it of your argument. Right well, yes, and counsel on appeal characterizes these comments as a hypothetical. And if only the prosecutor below had explained that use that word, put put things in that context. That we might have a different story, but that word isn't used anywhere. This is this is an argument by a prosecutor in a child death case to 12 people sitting there. Paying on every word of this prosecutor and she said. I believe that she said, 4 and a half minutes or 4 minutes and 20 seconds or whatever it was and that and there's no hypothetical about that. It was very clear. Very vivid. Okay, thank you. Thank you. Are there any questions from the court? Nothing further from me. Nothing for me. Okay. Well, thank you counsel both for your arguments in this matter this afternoon. It will be taken under advisement written disposition shall issue.